Rosie Nell HOLCOMB, as Administratrix of the Estate of Barbara Jean Smith, Deceased,

v.

HUMANA MEDICAL CORPORATION, INC., d/b/a Humana Hospital–Montgomery.

Civ. A. No. 92–A–522–N.

United States District Court, M.D. Alabama, N.D.

Aug. 26, 1993.

Tom Dutton, Pittman, Hooks, Marsh, Dutton & Hollis, Birmingham, AL, for plaintiff.

Armstead Lester Hayes, III, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, for defendant.

### MEMORANDUM OPINION

ALBRITTON, District Judge.

### I. INTRODUCTION

This cause is now before the court on the Motion for Summary Judgment filed by the Defendant, Humana Medical Corporation d/b/a Humana Hospital–Montgomery ("Humana") on June 9, 1993.[1]

Rosie Nell Holcomb ("Holcomb"), administratrix of the estate of Barbara Jean Smith, deceased, filed this action on April 27, 1992 against Humana and Paul P. Monahan, M.D.[2] alleging violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, *et seq.* EMTALA commonly known as the Anti–Patient Dumping Act, was enacted as part of the Consolidated Budget Omnibus Reconciliation Act of 1985 ("COBRA").

Holcomb alleges that Humana failed to provide Ms. Smith with an "appropriate medical screening examination" and discharged her in an "unstabilized condition." Holcomb further alleges that as a result of Humana's conduct plaintiff's decedent died on May 9, 1990.

Humana denies all of the allegations and contends that it satisfied the requirements under EMTALA.

For the reasons stated below, Humana's Motion for Summary Judgment is due to be granted.

### II. FACTS

On May 4, 1990, at approximately 11:00 p.m., Barbara Jean Smith entered the emergency room of Humana Hospital in Montgomery, Alabama. She informed the admitting nurse that she had given birth within the last week and complained of fever, aching all over, a sore throat, and coughing. Her temperature was 104.3, pulse 146, respiration 32, and blood pressure 112/64. Nevertheless, she was alert and oriented. Moreover, her vaginal bleeding was normal given a recent delivery.

Ms. Smith was first examined by Larry Abrams, a physician's assistant, who took her medical history and gave her a physical examination. Next, she was seen by Dr. Paul P. Monahan, the doctor on call in the emer-

---

1. Oral arguments were made at a hearing before this court on August 20, 1993.

2. The Complaint against Paul P. Monahan, M.D. was dismissed for lack of subject matter jurisdiction by an Order dated November 30, 1992.

gency room ("ER") that night. Dr. Monahan also gave her a physical. It included listening to her lungs, and examining her abdomen and back. He immediately ordered Tylenol and IV fluids as treatment.

After discussing Ms. Smith's condition with her, Dr. Monahan ordered several tests to determine whether she suffered from a bacterial infection or a viral infection. The tests consisted of a urine analysis and a White Blood Count Test (WBC). The WBC test indicated that Barbara Smith was suffering from a viral infection. Furthermore, because Ms. Smith had a cough, a chest x-ray was taken to determine whether she had pneumonia. After reviewing the results of the tests, the physical examinations, and her medical history, Dr. Monahan diagnosed Ms. Smith as having acute viral syndrome (flu). Thereafter, she was kept in the ER overnight and was given Tylenol and IV fluids.

Dr. Monahan saw Ms. Smith twice more that night. During the first visit, he performed another physical exam. During the second, he asked how she was feeling and whether anything had developed with her condition. After Ms. Smith told him that she felt better and after noting that her vital signs had returned to normal, Dr. Monahan determined that she was medically stable and ordered that she be discharged. He instructed her to stay in bed, drink lots of fluids, and return to the ER immediately if she felt that she was getting worse. Ms. Smith was discharged from Humana at 6:00 a.m. on May 5, 1990.

After returning home, Ms. Smith initially informed Rosie Holcomb that she was feeling better; however, later that day she began to feel worse. On May 6, 1990, at approximately 9:00 p.m., Ms. Smith was admitted to Jackson Hospital. While at Jackson, she was diagnosed as suffering from endometritis.[3] Subsequently, on May 9, 1990, Barbara Jean Smith died.

### III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant, either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element to his claims, and on which he bears the burden of proof at trial. *Id.* To satisfy this burden, the nonmovant cannot rest on the pleadings, but must by affidavit or other appropriate means, set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), *Fed.R.Civ.P.*

The court's function in deciding a motion for summary judgment is to determine whether there exists genuine, material issues of fact to be tried, and if not, whether the movant is entitled to a judgment as a matter of law. *See Dominick v. Dixie National Life Insurance Company,* 809 F.2d 1559 (11th Cir.1987). It is the substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986). *See also De Long Equipment Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir. 1989).

When the court considers a motion for summary judgment it must refrain from deciding any material factual issues. All the evidence and the inferences from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion International Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356,

---

3. Endometritis is the "[i]nflamation of the membrane which lines the interior of the uterus." 2 *Schmidt's Attorneys' Dictionary of Medicine* at E–95 (1993).

89 L.Ed.2d 538 (1986). The movant bears "the exacting burden of demonstrating that there is no dispute as the any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983). *See also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

With these rules and principles of law in mind, the court will determine whether summary judgment is appropriate or whether there exist genuine issues of material fact that should properly proceed to trial for resolution. Although this cause is before the court for consideration of defendant's motion, in order to survive summary judgment plaintiff must at least establish the necessary elements of her cause of action and demonstrate the presence of a genuine issue of material fact. *Lowe v. Aldridge,* 958 F.2d 1565, 1569 (11th Cir.1992).

## IV. LIABILITY STANDARD UNDER § 1395dd

Congress enacted EMTALA to address its concern with preventing "patient dumping."[4] H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 3, at 5, (1986) *reprinted in* 1986 U.S.C.C.A.N. 42, 579, 726; 131 Cong. Rec. H9503 (Oct. 31, 1985); 131 Cong. Rec. S13903 (Oct. 23, 1985). The purpose of EMTALA was not to guarantee all patients a proper diagnosis or even to ensure that they receive adequate care, but rather to provide an "adequate first response to a medical crisis" for all patients and "send a clear signal to the hospital community ... that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress." 131 Cong. Rec. S13904 (Oct. 23, 1985) (statement of Sen. Durenberger).

The starting point of our analysis is, of course, the statutory language. Section 1395dd(a)[5] requires hospitals to provide any person requesting treatment for a medical condition with "an appropriate medical screening examination within the capability of the hospital's emergency department." In addition, should the hospital determine that the individual suffers from an "emergency medical condition,"[6] it must provide whatever treatment (within its capabilities) is needed to stabilize the condition prior to transferring or discharging the patient. 42 U.S.C. § 1395dd(b)(1).[7] If a hospital fails to satisfy either of these requirements, it may be subjected to two types of sanctions. First, under § 1395dd(d)(1), a hospital that "negligently" violates the statute may, at the initiative of the Secretary of Health and Human Services, be subject to a civil money penalty of not more than $50,000 for each violation and termination or suspension of its medicare provider agreement. Second, under § 1395dd(d)(2), a hospital that violates the statute may be liable for damages in a civil

---

**4.** Patient dumping is the practice whereby hospital emergency rooms deny uninsured patients the same treatment accorded paying patients, either by refusing care outright or by transferring them to other facilities. *See* Karen I. Treiger, Note, *Preventing Patient Dumping: Sharpening the CObRA's Fangs,* 61 N.Y.U. L.Rev. 1186 (1986).

**5.** Subsection 1395dd(a) reads as follows:

if any individual (whether or not eligible for [Medicare] benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capabilities of the hospital's emergency department.

42 U.S.C. § 1395dd(a).

**6.** EMTALA defines "an emergency medical condition" as:

a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual ... in serious jeopardy; (ii) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1)(A).

**7.** Subsection 1395dd(b) reads as follows:

[i]f any individual (whether or not eligible for [Medicare] benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility ...

action brought by the patient harmed by the violation. Holcomb's claim arises under this second, subsection (d)(2), cause of action.

■ With regard to the alleged violation of § 1395dd(a), a party can prove a violation of that provision only by showing that the hospital failed to provide an "appropriate medical screening examination." This term is not defined in the statute and the Eleventh Circuit has not addressed the term. The three circuits which have considered the meaning of the term, the Sixth, D.C., and Fourth, however, have provided consistent definitions. In *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 271 (6th Cir.1990), the Sixth Circuit defined "appropriate" as meaning "care similar to care that would have been provided to any other patient, or at least not known by the providers to be insufficient or below their own standards." The D.C. Circuit has held that what is "appropriate" can be determined "not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures." *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991). In *Baber v. Hospital Corp. of America,* 977 F.2d 872, 881 (4th Cir.1992), the Fourth Circuit held that a hospital has satisfied the requirements of § 1395dd(a) "if its standard screening procedure is applied uniformly to all patients in similar medical circumstances." [8] The court finds these decisions to be persuasive and feels that the Eleventh Circuit would agree.

Section 1395dd(a) entitles an individual to the standard screening procedure accorded by that hospital to other patients complaining of the same problem or exhibiting the same symptoms. Should that not be provided to a patient, that patient's rights under EMTALA will have been violated.

■ Moreover, § 1395dd(a) is not designed to redress an incorrect diagnosis by a hospital; rather it is an entitlement to receive the same treatment that is accorded to others similarly situated. EMTALA does not attempt to create a federal standard of care or a federal cause of action for medical malpractice; it is no substitute for state malpractice actions. *See* 42 U.S.C. § 1395dd(f) (EMTALA does not preempt state law, except to the extent state law directly conflicts with this statute); *see also Brooks v. Maryland General Hospital,* 996 F.2d 708, 715 (4th Cir.1993); *Baber,* 977 F.2d at 880; *Gatewood,* 933 F.2d at 1041; *Cleland,* 917 F.2d at 272. It does not create a standard of care to be followed, but rather accepts for purposes of the Act that standard within the hospital's capabilities. The goal of the statute is the prevention of disparate treatment among patients.

Furthermore, it must be emphasized that the issue in this type of analysis is not the adequacy of the hospital screening procedure. A hospital that acts consistently with its customary screening procedure is not liable under § 1395dd(a) even if that standard is inadequate under the state's malpractice law.

■ With regards to the alleged violation of § 1395dd(b), a party must present evidence that (1) the patient had an emergency medical condition; (2) the hospital actually knew of that condition; (3) the patient was not stabilized before being transferred [9]; and (4) prior to transfer of an unstable patient, the transferring hospital did not obtain the proper consent or follow the appropriate certification and transfer procedures. *Baber,* 977 F.2d at 883. EMTALA requires a plaintiff to prove that the hospital had actual knowledge of the patient's emergency medical condition. *Id.; see also Gatewood,* 933 F.2d at 1041 (stabilization and transfer provisions "are triggered only after a hospital determines that an individual has an emergency medical condition"); *Cleland,* 917 F.2d at 271 ("[i]f the emergency nature of the

---

**8.** There is one distinction between the tests employed by the Sixth Circuit and the D.C. Circuit. It is that the latter would impose liability for any disparate treatment, regardless of the hospital's motivation, *Gatewood,* 933 F.2d at 1041, while the former will only impose liability if the hospital had a bad motive in providing the disparate treatment, *Cleland,* 917 F.2d at 272. The Fourth Circuit has yet to determine which view it considers to be correct. *Baber,* 977 F.2d at 880 n. 8.

**9.** Under EMTALA the meaning of the term "transfer" includes the discharge of the patient. 42 U.S.C. § 1395dd(e)(4).

condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition").

## V. ANALYSIS

With this analytical framework in mind, the court will determine whether summary judgment is appropriate or whether there exist genuine issues of material fact that should properly proceed to trial for resolution.

In regards to § 1395dd(a), the court, in this instance, must determine whether there is any genuine issue of material fact regarding whether Humana gave Barbara Jean Smith a medical screening that differed from its standard screening procedure. Holcomb does not allege that Humana's ER personnel treated Ms. Smith differently from its other patients. Instead, she merely claims that Dr. Monahan did not do enough to accurately diagnose her condition. Specifically, Holcomb contends that Dr. Monahan's failure to do a pelvic examination, which may have revealed a pelvic infection, rendered the screening examination inappropriate.

Evidence challenging the adequacy of a screening examination is not sufficient to establish an EMTALA violation under § 1395dd(a). The critical element of an EMTALA cause of action is not the adequacy of the screening examination but whether the screening examination that was performed deviated from the hospital's customary procedures for evaluating a patient in a similar condition.

█ The record is clear that Ms. Smith was initially examined by Larry Abrams, a physician's assistant and than again by Dr. Monahan. A history of her complaints was taken and her vital signs were obtained. In addition, laboratory tests and x-rays were performed. Based on this information, Dr. Monahan concluded that Ms. Smith was suffering from the flu and prescribed Tylenol and IV fluids. Ms. Smith remained in the ER overnight and was seen by Dr. Monahan twice more before her discharge the next morning.

Dr. Monahan testified in his deposition that he was aware that Ms. Smith was a Medicaid patient, but that there existed no different criteria for treating Medicaid patients as opposed to non-Medicaid patients. He also testified that he did not perform a pelvic exam, because Ms. Smith had no complaints of abdominal pain, had no change in her menses, and had no pain on physical examination of her abdomen.

Moreover, Barbara Bentley, Humana's Assistant Executive Director of Nursing in 1990, testified that after a review of Ms. Smith's records and of the policy and procedure manual of the ER, it was her opinion that Ms. Smith was provided with a screening examination that the hospital would have provided to any paying patient. Further, Dr. Philip Bobo, chief of emergency services at DCH Regional Medical Center in Tuscaloosa, Alabama, testified after reviewing Ms. Smith's record and the depositions of Dr. Peter Rosen, plaintiff's expert witness, and Dr. Monahan, there was no evidence that she was treated differently from any other patient.

Holcomb attempts to demonstrate a genuine issue of material fact by presenting the deposition of Dr. Peter Rosen, a practitioner of emergency medicine and contributing editor to emergency medicine textbooks. In his deposition, Dr. Rosen stated that Humana failed to perform an appropriate screening examination because Dr. Monahan failed to give Ms. Smith a pelvic examination. While Dr. Rosen's deposition may create an issue with regard to whether Dr. Monahan's treatment deviated from accepted medical standards of care, it does not create a material question of fact as to whether Dr. Monahan examined Ms. Smith any differently than any other patient with the same condition. In fact, Dr. Rosen conceded that there was no indication that Humana deviated from its standard treatment of a patient with a similar medical history, vital signs, and symptoms.

Additionally, Holcomb urges this court to reject the definition of "appropriate medical screening examination" established in *Cleland*, *Gatewood*, and *Baber*. She contends that equating an "appropriate medical screening examination" with the standard examination that the hospital in question would

accord other patients in similar circumstances as opposed to an examination comporting with generally accepted medical standards, will result in hospitals providing a lower standard of care to both insured and uninsured patients. The court rejects this argument as meritless, because to define an appropriate medical screening examination by reference to the applicable standard of medical care would convert EMTALA into a federal malpractice statute. This result is clearly not the intent of Congress. 42 U.S.C. § 1395dd(f); *see also Baber*, 977 F.2d at 880 ("[h]ad Congress intended to require hospitals to provide a screening examination [conforming to accepted medical standards], it could have specified a national standard").

Because Holcomb has offered no evidence of disparate treatment, the court concludes that summary judgment is due to be granted on the cause under § 1395dd(a).

■ With regards to § 1395dd(b), the court, in this instance, must determine whether there is any genuine issue of material fact regarding whether (1) Ms. Smith had an emergency medical condition; (2) Humana had actual knowledge of the condition; and (3) Ms. Smith was not stabilized prior to her discharge even though Humana knew of her emergency medical condition.

Although Ms. Smith's death indicates that her condition at some point was an emergency medical condition, Holcomb has failed to demonstrate that the emergency condition existed at the time of her discharge. The record indicates that by the time of her discharge Ms. Smith's vital signs had returned to normal and she stated that she was feeling better. Dr. Monahan testified in his deposition that when he discharged her, she was coherent and able to walk out of the ER without assistance. Furthermore, he stated that in his opinion she was medically stable.

Moreover, Crystal Singer Wadsworth, charge nurse on duty in the ER at the time of Ms. Smith's discharge, testified in her deposition that if Ms. Smith was not alert or not oriented or if she was complaining of increased pain she would not have discharged her.

■ Holcomb attempts to establish a material issue of fact by simply presenting Dr. Rosen's opinion that Ms. Smith was not medically stable at the time of her discharge. However, analysis by hindsight is not sufficient to impose liability under EMTALA. *Baber*, 977 F.2d at 882.

■ Furthermore, Holcomb has produced no evidence demonstrating that Humana had actual knowledge that Ms. Smith was in an emergency condition at the time of her discharge. Her only piece of evidence is a notation in the admission records labeling Ms. Smith's condition as an emergency. This, however, was at the time of admission, not at the time of discharge. In fact, Dr. Rosen conceded that there was no indication that Humana had actual knowledge of an emergency medical condition at the time of discharge. If the emergency nature of a patient's condition is not discovered, the hospital cannot be charged with failure to stabilize a known emergency condition. *Cleland*, 917 F.2d at 271.

It is clear that at the time of her discharge Ms. Smith's condition appeared stable. She was not in distress, and neither the doctor nor the patient had any indication that the condition was worsening, or that it would become life-threatening, or that it would worsen by the next day. Although, in hindsight, Ms. Smith's stability was short-run, EMTALA was not intended to guarantee ER treatment and discharge. In Humana's opinion the patient was stable at the time of her discharge; therefore, it met the requirements under EMTALA.

Holcomb has failed to meet the burden of showing that a genuine issue of material fact exists for purposes of this summary judgement motion. The court finds that there are no legitimate questions of fact relative to this EMTALA claim and that the defendant is entitled to a judgment as a matter of law. The Motion for Summary Judgment is due to be granted.

### CONCLUSION

EMTALA does not create a federal cause of action for malpractice. In the context of this case, its design is to assure that all

patients who come to a hospital's emergency room receive similar treatment there and that they are not knowingly discharged in emergency conditions which have not been stabilized. If the hospital meets those requirements, there is no claim under EMTALA, even though the facts may give rise to a claim for malpractice under state law.

Holcomb has failed to establish a claim under EMTALA. She has produced no evidence that the screening examination that Humana provided Ms. Smith deviated from the customary screening examination that it would have provided to any other patient with a similar condition. Further, Holcomb has failed to establish that Ms. Smith was in an emergency medical condition at the time of her discharge and that Humana had actual knowledge of that condition. There are, therefore, no genuine issues of fact to be determined at a trial of this case.

Accordingly, for the foregoing reasons, the Motion for Summary Judgment is due to be granted. A separate order will be issued in accordance with this memorandum opinion.

### JUDGMENT

In accordance with the memorandum opinion entered on this day, the Motion for Summary Judgment filed by the defendant is hereby GRANTED and judgment is entered in favor of the defendant Humana Medical Corporation, d/b/a Humana Hospital–Montgomery, and against the plaintiff. Costs are taxed against the plaintiff.