**Brandy J. WILLIAMSON, Plaintiff,**

v.

**Steven A. ROTH, individually, Armando L. Rojas, individually, d/b/a Genesis Women's Center, P.A., Genesis Women's Center, Inc., and Citrus Memorial Health Foundation, Defendants.**

No. 5:98–CIV–299–OC–10.

United States District Court,
M.D. Florida,
Ocala Division.

Aug. 11, 2000.

James Murray Milliken, Law Office of J. Murray Milliken, Floral City, FL, for Plaintiffs.

C. Howard Hunter, III, Karen A. Dean, Freeman, Hunter & Malloy, Tampa, FL, Jean Annette Bice, Scott Gove Reichert, Bice, Glenny, Sanders & Reichert, P.L., Ocala, FL, for Defendants.

## *ORDER*

JONES, United States Magistrate Judge.

Pending before the Court are: (1) Defendant, Citrus Memorial Health Foundation,. Inc.'s, Motion For Summary Judgment And Supporting Memorandum Of Law (Doc. 31); (2) Plaintiff's Memorandum Of Law In Opposition To Motion For Summary Judgment (Doc. 48); and (3) Defendant, Citrus Memorial Health Foundation, Inc.'s, Reply Brief To Plaintiff's Memorandum Of Law In Opposition To Motion For Summary Judgment (Doc. 67). In this case, Plaintiff has brought suit against Citrus Memorial Health Foundation, Inc. ("Citrus Memorial"), as well as two private physicians, for violations of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, *et seq.* ("EMTALA") and for medical malpractice under Florida law, section 766.102 of the Florida Statutes. Upon due consideration, the Court concludes that partial summary judgment is due to be **GRANTED** as to the Plaintiff's claim under 42 U.S.C. § 1395dd(a); **DENIED** as to the Plaintiff's claim under 42 U.S.C. § 1395dd(b); and **DENIED** as to Plaintiff's state law medical malpractice claim.

## Background and Facts

The pleadings, memoranda, affidavits, and other evidence in the record, construed in the manner most favorable to the Plaintiff, disclose the following details.

During May of 1996, the Plaintiff began receiving treatment during her pregnancy from Steven A. Roth, M.D., and Armando L. Rojas, M.D., two private physicians employed at the Genesis Women's Center, P.A. (Complaint, Doc. 2, ¶ 10.) On or about August 12, 1996, Dr. Rojas ordered an obstetrical ultrasound, which was performed by Dr. Robert Schoenfeld on August 13, 1996, revealing "normal fetal and cardiac motion." (Complaint, Doc. 2, ¶ 12, 13.)

On September 21, 1996, at approximately 10:00 p.m., the Plaintiff called Citrus Memorial and spoke to a registered nurse, Betty Eden, and informed Eden that she was having pain in the lower part of her abdomen and back, and that she felt like she was in labor. (Deposition of B. Williamson, Doc. 54, at 40–43.) Eden told the Plaintiff that she had a urinary tract infection, and that she should come to the hospital when her contractions were regulated so that she could be given medicine for the urinary tract infection. (Deposition of B. Williamson, Doc. 54, at 43.) The Plaintiff arrived at the hospital at approximately 2:40 a.m. on September 22, 1996, complaining of pain in her lower abdomen which radiated around to her back and an inability to urinate.[1] (Doc. 48, at 2.) The Plaintiff was examined and attended by Registered Nurses Betty Eden and Susan McNamana. (Doc. 48, at 2.) The nurses took a urine sample, performed a vaginal examination, took the Plaintiff's blood pressure, and attempted to attach a fetal monitor. (Deposition of B. Williamson, Doc. 54, at 50–51.) Upon examination, the nurses found that the Plaintiff's abdomen was soft. (Deposition of S. McNamana, Doc. 43, at 34; Deposition of B. Eden, Doc. 45, at 14.) The Plaintiff says she was told after being examined that she was one and a half centimeters dilated.[2] (Deposition of B. Williamson, Doc. 54, at 51.) The fetal heart monitor was not on the entire time the Plaintiff was in the hospital. (Deposition of B. Williamson, Doc. 54, at 52.) The Plaintiff was very agitated and, as a result, frequently changed positions. (Deposition of B. Williamson, Doc. 54, at 122–23.) The Plaintiff was told that she had a urinary tract infection and was given water and cranberry juice for the urinary tract infection. (Deposition of B. Williamson, Doc. 54, at 51.)

Nurse Eden telephoned Dr. Roth at approximately 3:30 a.m. (Doc. 48, at 2.) Nurse Eden could not specifically recall her conversation with Dr. Roth, but stated that she would have told him of the urinalysis, that they were unable to obtain a fetal monitor tracing, that the fetal heart rate was determined through the use of a hand Doppler, the results of the vaginal examination, the patient's blood pressure and the patient's complaints.[3] (Deposition

---

1. Notably, Plaintiff's Memorandum of Law In Opposition To Motion For Summary Judgment states on page two that Plaintiff complained of these problems. However, in her deposition on page 42, the Plaintiff says that she told Nurse Eden on the telephone that she was "trying to" urinate frequently, but that "nothing was coming out." Nurse McNamana testified in deposition that the Plaintiff complained of frequent urination when she presented at the hospital. (Deposition of S. McNamana, Doc. 43, at 15.)

 Further, the Plaintiff's Memorandum alleges that the Plaintiff complained of bleeding when she arrived at the hospital, but Plaintiff testified in deposition that she first noticed that she was bleeding when she was giving a urine sample while at the hospital and that she had not noticed bleeding at anytime before. (Deposition of B. Williamson, Doc. 54, at 54.)

2. However, Nurse McNamana testified in deposition that the Plaintiff was not dilated. (Deposition of S. McNamana, Doc. 43, at 14.)

3. Nurse McNamana could not remember in deposition the substance of the information relayed by Nurse Eden to Dr. Roth during the telephone conversation. (Deposition of S. McNamana, Doc. 43, at 22.) She testified that she knew Nurse Eden telephoned Dr.

of B. Eden, Doc. 45, at 22–23.) Between the Plaintiff's arrival at the hospital and 4:00 a.m., the Plaintiff was not seen by a doctor. (Doc. 48, at 2; Deposition of B. Williamson, Doc. 54, at 67.)

Following Nurse Eden's telephone conversation with Dr. Roth, the Plaintiff was discharged from the hospital at approximately 4:40 a.m.[4] (Doc. 48, at 3.) The Plaintiff told the nurses that she wanted to go home.[5] (Deposition of B. Williamson, Doc. 54, at 57; Deposition of B. Eden, Doc. 45, at 46–47.) The Plaintiff was given a prescription for the urinary tract infection, was told to drink a lot of water and juice, to take Tylenol 3 for pain, and to return to the hospital if the pain continued. (Deposition of B. Williamson, Doc. 54, at 60.) After returning home, Plaintiff began bleeding heavily, her pain got worse, her abdomen began tightening, and she started vomiting. (Deposition of B. Williamson, Doc. 54, at 62–63.)

The Plaintiff returned to the hospital at approximately 8:30 a.m. that same morning. (Doc.48, at 3.) Her stomach was hard and upon examination she was found to be bleeding. (Deposition of B. Williamson, Doc. 54, at 65–66.) Dr. Roth was contacted and ordered an ultrasound. (Deposition of B. Williamson, Doc. 54, at 67; Deposition of Dr. Roth, Doc. 39, at 62.) The ultrasound revealed a fetal demise and Plaintiff's child subsequently was delivered stillborn. (Doc. 48, at 3.)

The Plaintiff presented expert testimony through affidavit and deposition from two doctors, Drs. Morales and Hall. Dr. Morales testified by deposition that the care provided by the nurses at Citrus Memorial met the applicable standards, but he felt the nurses did not properly evaluate the level of pain experienced by the Plaintiff and did not properly evaluate the Plaintiff's fetus. (Deposition of Dr. Morales, Doc. 41, at 22–24, 37.) Dr. Hall testified by affidavit that Citrus Memorial breached the prevailing standard of care and the Plaintiff was discharged without an appropriate evaluation or stabilization. (Doc. 64.)

Defendant Citrus Memorial presented expert testimony through the affidavit of Dr. Ramus. Dr. Ramus testified by affidavit that Citrus Memorial appropriately discharged the Plaintiff pursuant to a physician's order and that there was no negligence on the part of the nurses or other hospital personnel.[6] (Doc. 34, at 5; Doc. 78, Ex. "A", at 4–5.)

---

Roth, that Nurse Eden told Dr. Roth that they were unable to obtain a continuous strip on the patient and that the patient was in pain, but could not recall if Nurse Eden told Dr. Roth of the Plaintiff's blood pressure. (Deposition of S. McNamana, Doc. 43, at 22.)

Dr. Roth testified that Nurse Eden told him that the Plaintiff presented with abdominal pain, that she was uncomfortable, that specifically there was no bleeding, that there were no contractions, that the cervix was closed, and that they had a hard time monitoring the baby because the Plaintiff was moving around in bed and seemed anxious, and, therefore, the nurse listened with the Doppler and handheld Doppler, and was able to pick up the fetal heart tones, which were normal. (Deposition of Dr. Roth, Doc. 39, at 18.)

4. The Plaintiff testified in deposition that she left the hospital at around 4:00 a.m. (Deposition of B. Williamson, Doc. 54, at 59.)

5. According to the testimony of Dr. Roth, after the first telephone call from Nurse Eden,

he requested that Plaintiff remain in labor and delivery for observation and that a urinalysis be obtained. (Deposition of Dr. Roth, Doc. 39, at 61.) Dr. Roth testified that he received a second telephone call thereafter with the urinalysis information and at that time he was told that Plaintiff's abdominal pain had significantly improved to the point that she requested that she be allowed to go home. (Deposition of Dr. Roth, Doc. 39, at 62.) However, the Plaintiff testified that she did not tell the nurses that her pain had improved and that she only told them she wanted to go home if they were not going to do anything to help her. (Deposition of B. Williamson, Doc. 54, at 57.)

6. The Court notes that the affidavit of Dr. Ramus dated January 31, 2000, which is attached to Defendant Citrus Memorial's Supplement To Motion For Summary Judgment (Doc. 78) was the subject of an Objection and Motion To Strike (Doc. 81) filed on May 23, 2000, by the Plaintiff. Thereafter, in re-

Plaintiff commenced this action by filing a complaint in state court. In six counts, the Complaint alleged state medical malpractice claims, as well as claims under the Emergency Medical Treatment and Active Labor Act. The Complaint was filed against Drs. Roth and Rojas and Citrus Memorial Hospital. Citrus Memorial removed the case to this Court on October 21, 1998. Defendants Roth and Rojas, as well as Defendant Citrus Memorial, filed motions to dismiss the claims brought pursuant to EMTALA. (Docs. 3 & 5.) This Court issued an Order dated July 12, 1999, dismissing Counts II & IV of the Complaint with prejudice. (Doc. 26.) On November 30, 1999, the Plaintiff filed a Notice of Voluntary Dismissal With Prejudice dismissing Defendant Rojas in this cause. (Doc. 29.)

Defendant Citrus Memorial filed its Motion For Summary Judgment and Supporting Memorandum of Law on December 22, 1999. (Doc. 31.) Defendant moves this Court to enter summary judgment in its favor on the Plaintiff's state malpractice claim and the Plaintiff's claims under EM-TALA.

### *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the non-moving

party." *Samples on Behalf of Samples v. Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in *Celotex Corp. v. Catrett*, the moving party bears the initial burden of informing the court of the basis of the motion and of establishing the nonexistence of a triable issue of fact. *See* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth*, 833 F.2d 1525, 1528 (11th Cir.1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* at 587, 106 S.Ct. 1348.

### *DISCUSSION*

In the instant case, the Plaintiff brings two distinct claims under EMTALA. The Court will address each of these claims in turn: (1) the Plaintiff's claim under 42 U.S.C. § 1395dd(a), the medical screening requirement; and (2) the Plaintiff's claim under 42 U.S.C. § 1395dd(b), the stabiliz-

---

sponse, the Defendant filed Defendant Citrus Memorial Health Foundation, Inc.'s Withdrawal of Supplements To Pleadings (Doc. 84) referencing the supplement to the motion for summary judgment. Nonetheless, the Court has included citations to the affidavit of Dr. Ramus for the purpose of providing complete background information. However, none of the facts or evidence presented by the affidavit of Dr. Ramus attached to the supple-

ment to the motion for summary judgment was dispositive of any of the issues discussed herein and was considered simply for additional factual information. Additionally, it should be noted that Defendant Citrus Memorial previously filed an affidavit of Dr. Ramus on December 28, 1999, (Doc. 34) which the Court also considered for background and factual information.

ing treatment for emergency medical conditions requirement. A discussion of the pendant state law claim, the Plaintiff's state medical malpractice claim, will follow.

### Emergency Medical Treatment and Active Labor Act ("EMTALA")

EMTALA was enacted by Congress in 1986 "in response to a growing concern that hospitals were 'dumping' patients unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized."[7] *Brooks v. Maryland Gen. Hosp.*, 996 F.2d 708, 710 (4th Cir.1993). The purpose of the Act was not to guarantee that all patients receive a proper diagnosis or even to guarantee that the patients receive appropriate care, but rather to provide an " 'adequate first response to a medical crisis' for all patients and 'send a clear signal to the hospital community . . . that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress.' " *Holcomb v. Humana Med. Corp., Inc.*, 831 F.Supp. 829, 832 (M.D.Ala.1993)(citing 131 Cong. Rec. S13904 (Oct. 23, 1985)(statement of Sen. Durenberger)).

### Section 1395dd(a) of EMTALA "Medical Screening Requirement"

■ Section 1395dd(a) of EMTALA requires hospitals to provide persons requiring emergency medical treatment with "an appropriate medical screening examination." *See* 42 U.S.C. § 1395dd(a). EMTALA does not define "appropriate medical screening examination." *See id.* The congressional purpose behind EMTALA supports the conclusion, which has been followed by the Eleventh Circuit Court of Appeals and a number of other courts, that this language only requires a hospital to provide indigent patients with a medical

screening similar to one which they would provide to any other patient. *See* H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 3 at 5 (1986) *reprinted in* 1986 U.S.C.C.A.N. 579; *see also Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994), *aff'g Holcomb v. Humana Med. Corp., Inc.*, 831 F.Supp. 829 (M.D.Ala. 1993); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir.1990); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037 (D.C.Cir.1991).

■ Section 1395dd(a) does not create a federal malpractice claim and is not designed to redress a negligent diagnosis by a hospital. *See Holcomb*, 30 F.3d at 117. "As long as a hospital applies the same screening procedures to indigent patients which it applies to paying patients, the hospital does not violate this section of EMTALA." *Id.* Therefore, "[e]vidence of disparate treatment is at the core of such an EMTALA [§ 1395dd(a) ] claim." *Gerber v. Northwest Hosp. Center, Inc.*, 943 F.Supp. 571, 577 (D.Md.1996); *see also Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 144 (4th Cir.1996)("EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment."); *Holcomb*, 30 F.3d at 117 (11th Cir.1994)(holding that, as the district court noted, no evidence suggested that the claimant received disparate treatment from other patients and, thus, summary judgment was appropriate); *Gardner v. Elmore Comm. Hosp.*, 64 F.Supp.2d 1195, 1202 (M.D.Ala.1999)(holding that summary judgment is proper if a plaintiff fails "to show the hospital treated [plaintiff] differently from other patients, an essential element of a claim under § 1395dd(a)")(citing *Williams v. Birkeness*, 34 F.3d 695, 697 (8th Cir.1994)).

In support of its Motion for Summary Judgment on section 1395dd(a) of EMTALA, Defendant Citrus Memorial argues

---

**7.** "Patient dumping" is the practice whereby a hospital emergency room denies uninsured, or indigent, patients the same treatment that is accorded to paying patients, either by refus-

ing to treat or by transferring them to other facilities. *See* Karen I. Treiger, Note, *Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61 N.Y.U. L.REV. 1186 (1986).

that the Plaintiff was appropriately screened and did not receive disparate treatment under the hospital's screening procedures. (Doc. 31, at 10.) Defendant Citrus Memorial points to the affidavit of Margie Leturno, R.N., obstetrical nurse manager, which establishes the two procedures in place pertinent to the presentation of an obstetrical patient such as the Plaintiff. (Doc. 31, at 10; procedures attached as Exs. "A" and "B".) Further, Dr. Ramus testified by affidavit that the nurses taking care of the Plaintiff complied with the hospital screening procedures. (Doc. 31, at 11.) Additionally, the nurses themselves testified that the Plaintiff received the same treatment as any other patient presenting with the same clinical picture. (Doc. 21, 12–14.)

■ Plaintiff contends that Defendant Citrus Memorial violated the terms of its own policy and procedure because the Plaintiff was not evaluated by an obstetrician, nor a physician, prior to being discharged from the hospital. (Doc. 48, at 6.) Also, the Plaintiff argues that the issue of whether a telephone call to an obstetrician by a nurse can be considered an evaluation is a question of fact to be determined by a jury. (Doc. 48, at 6.) Finally, the Plaintiff states that "[t]he Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd requires that a hospital, when presented with a patient such as Williamson, must provide either (1) further medical examination and such treatment as may be required to stabilize the medical condition or (2) transfer the patient to an appropriate medical facility," which Defendant Citrus Memorial did not do. (Doc. 48, at 6–7.)

In response to the Motion for Summary Judgment, the Plaintiff attempts to demonstrate a genuine issue of material fact by presenting the affidavit of her expert, Dr. Hall. Dr. Hall stated that while the hospital procedures appeared to be "appropriate

procedures" for the screening of patients who present as Plaintiff did, the nurses on duty at the hospital failed to follow hospital procedures in a variety of ways, i.e. the Plaintiff was not evaluated by an emergency department physician, a fetal heart monitor was not attached, and the nurses ignored the Plaintiff's symptoms. (Doc. 64.) Further, Dr. Hall stated that the hospital did not follow its established procedures in the evaluation and stabilization of the Plaintiff. (Doc. 64.)

These facts, however, are immaterial because, notwithstanding the affidavit of Dr. Hall, the Plaintiff fails to address the relevant consideration of a claim under § 1395dd(a) of EMTALA. The Plaintiff fails to present any evidence that she received disparate treatment from other individuals perceived to have the same medical condition. *See Gerber*, 943 F.Supp. at 577. Therefore, the record does not contain any evidence that creates a genuine issue of material fact as to this issue. Based on the foregoing, partial summary judgment on the Plaintiff's claim under 42 U.S.C. § 1395dd(a) is due to be **GRANTED**.

### Section 1395dd(a) of EMTALA "Necessary Stabilizing Treatment for Emergency Medical Conditions and Labor"

■ Section 1395dd(b) of EMTALA requires that after a hospital determines that a patient is experiencing an "emergency medical condition" it must provide "whatever treatment, within its capabilities, is needed to stabilize the condition before transferring or discharging the patient."[8] *Holcomb*, 30 F.3d at 117. Success on a section 1395dd(b) claim requires that a plaintiff present evidence that: (1) the patient had an emergency medical condition; (2) the hospital knew of the condition; (3) the patient was not stabilized before being transferred; (4) and the hospital did not

---

**8.** An "emergency medical condition" is defined as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain)...." 42 U.S.C. § 1395dd(e)(1)(A).

obtain the patient's consent to transfer and did not complete a certificate indicating that transfer would be beneficial and was appropriate.[9] *See id.*

 However, EMTALA does not "hold hospitals accountable for failing to stabilize conditions of which they were not aware, or even conditions of which they should have been aware ... EMTALA would otherwise become coextensive with malpractice claims for negligent treatment." *Gerber*, 943 F.Supp. at 577 (citing *Vickers*, 78 F.3d at 145). However, this section of EMTALA "takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions they actually detect." *Vickers*, 78 F.3d at 145. Further, "[i]f the emergency nature of a patient's condition is not discovered, the hospital cannot be charged with failure to stabilize a known emergency condition." *Holcomb*, 831 F.Supp. at 835; *see also Cleland*, 917 F.2d at 271. "Analysis by hindsight is not sufficient to impose liability under EMTALA." *Holcomb*, 831 F.Supp. at 835.

In support of its Motion for Summary Judgment on section 1395dd(b) of EMTALA, Defendant Citrus Memorial argues that the hospital did not breach its duty to stabilize the Plaintiff under this section because, even if it is assumed that the Plaintiff was experiencing a placental abruption, hospital staff, including Dr. Roth, were not aware that the Plaintiff was experiencing a placental abruption. (Doc. 31, at 16). Therefore, the hospital cannot be held accountable under EMTALA for failure to stabilize such a condition because EMTALA does not hold hospitals accountable for failing to stabilize conditions of which they are not aware. (Doc.31, at 16–18.)

Plaintiff argues in her response that the hospital did not provide "further medical examination and such treatment as may be required to stabilize the medical condition or ... transfer the patient to an appropriate medical facility." (Doc. 48, at 7.) Plaintiff alleges that if the hospital had followed its own procedure and required an obstetrician to evaluate the Plaintiff, then "the obstetrician would have been in a better position to properly evaluate the degree of Williamson's pain, the location of the pain, and the well being of her baby." (Doc. 48, at 6.) Additionally, the Plaintiff relies on the testimony of Dr. Morales who stated that pain is a potential sign of a placental abruption. (Deposition of Dr. Morales, Doc. 41, at 21.) Plaintiff concludes that "Citrus Memorial Hospital discharged Williamson without ascertaining the condition of the fetus or treating Williamson for her pain." (Doc. 48, at 6.)

Plaintiff's primary argument on this issue appears to be that she was experiencing a placental abruption, or something other than the diagnosed urinary tract infection, and, therefore, was not stabilized when she was discharged from the hospital. Secondarily, she seems to argue that the hospital failed to evaluate her appropriately so as to ascertain the extent of her condition or the condition of her fetus. In reviewing the facts and evidence presented in the record in the light most favorable to the Plaintiff, and for the reasons that follow, the Court finds that there is sufficient evidence in the record to present a genuine issue of material fact as to whether the Plaintiff was stabilized prior to her discharge from the hospital.

Because the Plaintiff's fetus was eventually delivered stillborn, there is an indication that the Plaintiff's condition was at some point an "emergency medical condition." The record reveals that the Plaintiff presented to the hospital complaining of pain in her lower abdomen, which radiated around to her back, and an inability to urinate. (Doc. 48, at 2.) The Plaintiff also testified in deposition that she first noticed bleeding when she was giving a urine sample while at the hospital. (Depo-

9. In this instance, "transfer" means the movement of a patient outside a hospital's facilities and includes discharge from the hospital. *See* 42 U.S.C. § 1395dd(e)(4).

sition of B. Williamson, Doc. 54, at 54.) She testified that she had not noticed bleeding at anytime before. (Deposition of B. Williamson, Doc. 54, at 54.) In addition, Nurse Eden told Dr. Roth that the Plaintiff was not experiencing any bleeding. (Deposition of Dr. Roth, Doc. 39, at 18.)

The Plaintiff also testified that she was told after being examined that she was one and a half centimeters dilated. (Deposition of B. Williamson, Doc. 54, at 52.) However, Nurse McNamana testified that the Plaintiff was not dilated upon examination and Nurse Eden told Dr. Roth that the Plaintiff was not experiencing any contractions. (Deposition of S. McNamana, Doc. 43, at 14; Deposition of Dr. Roth, Doc. 39, at 18.)

Dr. Roth testified that after the initial telephone call he requested that the Plaintiff remain in labor and delivery for observation and that a urinalysis be obtained. (Deposition of Dr. Roth, Doc. 39, at 61.) He testified that he received a second telephone call reporting the Plaintiff's urinalysis information and was told at that time that the Plaintiff's abdominal pain had significantly improved and the Plaintiff was requesting that she be allowed to go home. (Deposition of Dr. Roth, Doc. 39, at 62.) However, the Plaintiff testified that she did not tell the nurses that her pain had improved and only told them she wanted to go home if they were not going to do anything to help her. (Deposition of B. Williamson, Doc. 54, at 57.)

The Plaintiff was discharged from the hospital at 4:40 a.m. following Nurse Eden's telephone conversation with Dr. Roth.[10] (Doc. 48, at 3.) Based on the Plaintiff's complaints and the results of her examination, the Plaintiff was diagnosed with a urinary tract infection and told to return to the hospital if her pain contin-

ued. (Deposition of B. Williamson, Doc. 54, at 60.) However, the Plaintiff contends that she was sent home without seeing a physician, without being treated for pain, and without the well being of her fetus being determined. (Doc. 48, at 5–6.)

Dr. Morales testified by deposition that complaints of pain are prospectively a potential sign of an abruption. (Deposition of Dr. Morales, Doc. 41, at 21.) Dr. Roth testified that there was no indication that the Plaintiff had any clinical evidence of abruption. (Deposition of Dr. Roth, Doc. 39, at 53.) Dr. Hall, Plaintiff's expert, testified by affidavit that Citrus Memorial ignored the Plaintiff's symptoms and discharged her without the appropriate evaluation or stabilization. (Doc. 64.) Dr. Ramus, Defendant's expert, testified by affidavit that the hospital appropriately discharged the Plaintiff pursuant to a physician's order. (Doc. 34, at 5; Doc. 78, Ex. "A", at 4–5.)

Based on the foregoing, the Court finds that the Plaintiff has produced sufficient evidence that she was experiencing an "emergency medical condition" as defined by EMTALA. While there is some evidence in the record to suggest an inference that the Plaintiff may have been experiencing a placental abruption when she was at the hospital,[11] the Plaintiff has not presented any evidence that the hospital had actual knowledge at the time of her discharge that the Plaintiff was experiencing the inferred placental abruption emergency condition. The hospital had diagnosed and commenced treatment of a urinary tract infection. Regardless of whether the Plaintiff was experiencing a placental abruption when she was discharged, even if the hospital should have been aware of the placental abruption condition, under EMTALA, the hospital is not to be held accountable for failing to stabilize condi-

---

10. It is not clear from the evidence in the record whether this was the first or second telephone call to Dr. Roth, or whether there actually were two telephone calls to Dr. Roth from the nurses attending the Plaintiff.

11. Notably, the Court finds this inference weak at best.

tions of which they had no actual knowledge or even those of which they should have been aware.

■ However, irrespective of the foregoing discussion, the Court is of the opinion that there remains a genuine issue of material fact based on the evidence in the record as to whether the Plaintiff was stabilized—whether for a urinary tract infection or otherwise—when she was discharged from the hospital. For example, the Plaintiff's expert suggests that the hospital ignored the Plaintiff's symptoms and discharged her without the appropriate evaluation or stabilization, (Doc. 64). In contrast the Defendant's expert testified that the hospital appropriately evaluated and discharged the Plaintiff (Doc. 34, at 5; Doc. 78, Ex. "A", at 4–5). Dr. Roth was told by Nurse Eden that the Plaintiff's abdominal pain had significantly improved to the point that she requested that she be allowed to go home (Deposition of Dr. Roth, Doc. 39, at 62). While the Plaintiff testified that she did not tell the nurses that her pain had improved and that she only told them she wanted to go home if they were not going to do anything to help her (Deposition of B. Williamson, Doc. 54, at 57). Based on the foregoing the Court concludes there remains a genuine issue of material fact to be tried to a jury as to the Plaintiff's claim under section 1395dd(b) of EMTALA. Therefore, summary judgment on the Plaintiff's claim under 42 U.S.C. § 1395dd(b) is due to be **DENIED.**

### State Law Medical Malpractice Claim

Plaintiff's medical malpractice claim in Count V of the Complaint, is governed by Florida law. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). The Florida Legislature has promulgated standards for recovery in medical malpractice claims, as set forth in section 766.102 of the Florida Statutes. Section 766.102(1) provides that a plaintiff in a medical malpractice claim has the burden of proving by the greater weight of the evidence that the actions of a defendant health care provider breached the prevailing professional standard of care for that provider.

In support of its motion for summary judgment, Defendant Citrus Memorial states that the Plaintiff's expert witness, Dr. Walter Morales, an obstetrician, testified at deposition that the care provided by the nurses at Citrus Memorial met the applicable standards, that the nurses did what he would expect them to do, and that they acted properly in rendering care and treatment to the Plaintiff. (Doc. 31 at 5; Deposition of Dr. Morales, Doc. 41, at 37.) Defendant Citrus Memorial contends that the only question raised by Dr. Morales about the care rendered by the nurses, was what the nurses actually reported when Dr. Roth was contacted by telephone. (Doc. 31 at 6; Deposition of Dr. Morales, Doc. 41, at 54–55.) According to Defendant Citrus Memorial, the information that Dr. Morales said should have been communicated to Dr. Roth by the nurses to comply with the standard of care was actually provided to Dr. Roth in the telephone conversation with Nurse Eden. (Doc. 31 at 6–7; Deposition of Dr. Morales, Doc. 41, at 55–56; Deposition of Dr. Roth, Doc. 39, at 18.) Therefore, according to Defendant Citrus Memorial, there is no indication in the record that the nurses at Citrus Memorial breached the prevailing professional standard of care. (Doc. 31 at 8.)

Plaintiff disagrees and argues that Dr. Morales testified that the nurses did not properly evaluate the level of pain experienced by the Plaintiff and that the Plaintiff's fetus was not properly evaluated. (Doc. 48, at 5.) Further, Plaintiff alleges in her memorandum in opposition that Dr. Douglas Hall, Plaintiff's new expert, opines that Citrus Memorial Hospital did breach the prevailing standard of care. (Doc. 48, at 5.)

As discussed previously, Defendant Citrus Memorial argues that it is entitled to summary judgment on the Plaintiff's state medical malpractice claim because the evi-

dence in the record, specifically the depositions of Drs. Morales and Roth, and Nurses Eden and McNamara, establishes that there is no material issue of fact on the issue of whether Citrus Memorial breached the prevailing professional standard of care. However, in her memorandum of law the Plaintiff cites specific instances in which Dr. Morales testified that the nurses and/or the hospital did not properly evaluate the Plaintiff. Further, in the affidavit of Dr. Douglas Hall, Plaintiff's expert, there are specific references and statements which indicate that the nurses and the hospital did not follow the established procedures.

The evidence reveals that initially, Dr. Morales testified that there was substandard medical practice in the assessment of the Plaintiff. (Deposition of Dr. Morales, Doc. 41, at 20.) Specifically, Dr. Morales testified that the fetal well-being was not documented or established, that he could not see why the nurses were unable to obtain a fetal heart tracing, that auscultation of the fetal heart rate was inadequate, and he criticized Dr. Roth for not knowing of the fetal well-being before he released the Plaintiff from the hospital. (Deposition of Dr. Morales, Doc. 41, at 22–24, 43.) However, Dr. Morales testified that he did not necessarily expect Dr. Roth to come to the hospital to evaluate the Plaintiff. (Deposition of Dr. Morales, Doc. 41, at 27.) In addition, later, Dr. Morales testified that the nurses did not do anything below the acceptable standards, that they tried to do what he would expect them to do, that what the nurses did was proper, and that the Plaintiff was evaluated and discharged by an obstetrician. (Deposition of Dr. Morales, Doc. 41, at 37,54,74.) Further, Dr. Morales stated that if the nurses told Dr. Roth of the specific information he thought was necessary, then the nurses met the required standard of care. (Deposition of Dr. Morales, Doc. 41, at 54–56.) Dr. Roth's deposition confirmed that the nurses communicated to him the specific information deemed necessary by Dr. Mor-

ales. (Deposition of Dr. Roth, Doc. 39, at 18.)

The affidavit of Dr. Douglas Hall, Plaintiff's expert, takes issue with the standard of care provided by Citrus Memorial. Dr. Hall states that the nurses failed to follow hospital procedures, that Plaintiff was not evaluated by an emergency department physician, that the nurses did not attach a fetal heart monitor and obtain fetal heart tones, and that Plaintiff was discharged without being evaluated by an obstetrician. (Doc. 64.) Dr. Hall also opines that the nurses ignored the Plaintiff's symptoms and discharged her without appropriate evaluation or stabilization. (Doc. 64.)

Defendant's expert, Dr. Ronald Ramus, stated in his affidavit that there was no negligence on the part of the nurses or other hospital personnel that was the cause of the injury to the Plaintiff or her fetus, that the nurses appropriately examined and assessed Plaintiff and provided appropriate information to the Plaintiff's physician, and that the nurses appropriately carried out physician orders. (Doc. 78, Ex. "A", at 4.) Further, Dr. Ramus stated by affidavit that it is common and within the standard of care for an obstetrician to evaluate a patient, such as the Plaintiff, based on information received from nurses via telephone. (Doc. 78, Ex. "A", at 5.)

This discussion highlights the fact that a material issue of fact remains as to whether Defendant Citrus Memorial breached the prevailing standard of care. As the Supreme Court held in *Celotex Corp. v. Catrett,* the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. *See* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Here, while Defendant Citrus Memorial provided evidence supporting its view of the standard of care, the Court is of the opinion that there is additional evidence in the record, as outlined above, to the contrary. Through the affidavit of Dr. Hall, Plaintiff has demonstrated that a material fact issue remains to be tried as to whether the defendant breached the pre-

vailing professional standard of care in providing care to the Plaintiff. Therefore, summary judgment on the Plaintiff's state medical malpractice claim is due to be **DENIED.** Accordingly, it is:

**ORDERED AND ADJUDGED** that:

(1) Defendant, Citrus Memorial Health Foundation, Inc.'s, Motion For Summary Judgment (Doc. 31) is **GRANTED** as to Plaintiff's claim in Count VI of the Complaint under 42 U.S.C. § 1395dd(a);

(2) Defendant, Citrus Memorial Health Foundation, Inc.'s, Motion For Summary Judgment (Doc. 31) is **DENIED** as to Plaintiff's claim in Count VI of the Complaint under 42 U.S.C. § 1395dd(b);

(3) Defendant Citrus Memorial Health Foundation, Inc.'s Motion For Summary Judgment (Doc. 31) is **DENIED** as to Plaintiff's state law medical malpractice claim in Count V of the Complaint; and

(4) The Clerk is further directed to terminate the Plaintiff's Objection and Motion To Strike Defendant Citrus Memorial Health Foundation, Inc.'s Supplement To Motion For Summary Judgment (Doc. 81) as **MOOT.**